[No. 3107.]

## JOHN HARRISON v. THE STATE.

1. PRACTICE—BILL OF EXCEPTIONS, to be entitled to consideration, must have been presented to the trial judge for allowance and signature during the trial term, and within ten days after the conclusion of the trial. A trial is "concluded" by the judgment overruling a motion for new trial, or in the event that no such motion, and no motion in arrest of judgment is made, the conclusion of the trial is when the verdict of the jury has been received. The bill of exceptions in this case is sufficient

because approved in term time, and within ten days after the motion for new trial was overruled.

2. SAME—EVIDENCE—NEW TRIAL—CASE STATED.—Instead of confining his testimony to a statement of facts, a State's witness persisted in stating his suspicions and conclusions as to defendant's guilt. The defense objected, and requested that the examination of the witness by State's counsel be so confined as to elicit direct answers. The court refused to regulate the examination of the witness, but instructed him to confine his statements to facts in answer to questions propounded, and further directed the jury to disregard such statements of the witness as were merely suspicions, conclusions and opinions. Notwithstanding such instructions, the witness still persisted in injecting into his testimony statements which were not evidence, and were well calculated to prejudice the defendant. *Held*, that the court should have punished the recusancy of the witness as contempt of court by fine, or, if necessary, imprisonment. *Held*, further, that in view of the unsatisfactory nature of the inculpatory evidence, a new trial should have been awarded.

3. SAME—FACT CASE.—See statement of the case for evidence *held* insufficient to support a conviction for theft; wherefore the motion for new trial should have prevailed.

APPEAL from the District Court of Brazos. Tried below before the Hon. W. E. Collard.

The conviction in this case was for the theft of seventy dollars in money, the property of J. W. Tabor, in Brazos county, Texas, on the tenth day of August, 1881. A term of three years in the penitentiary was the punishment imposed.

The first witness for the State was J. W. Tabor. He testified, in substance, that one night, about the time mentioned in the indictment, he went to bed on his gallery, hanging his pants, which contained his pocket book and money, at the head of his bed. The defendant lived in a house about two hundred yards to the side, and a little in the rear of witness's house. The defendant customarily left his house early in the morning, but did not do so on the morning after the night spoken of, as the witness, when he first got up, and before he missed his money, saw him standing on the gallery of his house. Some time after he dressed the witness missed his pocket book and money, the money being fives, tens and twenty dollar United States currency bills, aggregating seventy dollars, but whether treasury or bank bills the witness did not know. Upon examination he found foot prints on the ground near the head of the bed, and in his yard, and followed them to his yard fence. The track indicated that the upper leather of a shoe had been torn from the

sole, and that, when the wearer walked, the upper part would lap over the sole and make an impression on the ground on both sides of the foot.

The witness and the defendant started to town from their homes on that morning at the same time, and met in the road. Witness then noticed that the uppers of a shoe worn by defendant were loose from the sole, and that they made a track similar in every respect to the tracks discovered in his, witness's, yard. Afterward, on the same morning, witness saw the defendant on the streets of Bryan, and had him make a track in the sand. That and the track in the witness's yard were in every particular similar. In having him make the track in the sand the witness used no more compulsory force than a peremptory order. The defendant hesitated, and made the track unwillingly. Previous to that witness had the defendant to make a track at his, witness's, store, but did not remember who was present. The witness had never consented to the taking of his money by any one.

Cross-examined, the witness stated the defendant was a negro. Neither he nor his wife had ever been in his, witness's, employ, and neither had ever been on his premises that he was aware of. Witness did not remember whether or not he had any negro employed at his stable at that time. He did not know the number of the shoe worn by the defendant at the time, nor the number of shoe that made the tracks in the yard. Defendant has a good-sized foot. The uppers of the shoe making the tracks described did not extend over the end of the foot and make impressions on the ground, but did on the sides. Uppers cut loose from the soles of a shoe will always make marks on impressionable ground. The person who made the tracks in the yard walked tip-toe until the fence was crossed. The track from the fence went in the direction of the defendant's house.

George R. Tabor, son of the prosecuting witness, testified, in substance, that he reached his father's house from his sleeping room in town about seven o'clock on the morning of the theft of the money, and then first heard of it. He examined the tracks in the yard, and described their peculiarity as the first witness did, except that he stated the loose upper made an impression only on one side of the foot, and the sole left an impression of pegs. He followed this track to the defendant's gate, where the defendant met him and asked him if he had lost any money, to which witness answered no, that he was hunting a place to dig a well. When defendant came out to meet witness he seemed

to put his whole foot down in walking. Witness did not notice his foot, but noticed the track he made, which was similar in appearance to those discovered in Tabor's yard. The track led from Tabor's yard fence to defendant's gate, as though to go in; it did not pass the gate or go away. Witness did not go into the defendant's yard or house. His gate opened on a public road.

The cross-examination resulted in no material change of this witness's testimony. Freedmantown was some three or four hundred yards distant from Tabor's house. One of the only two roads leading from the oil mills to Freedmantown passed directly in front of defendant's gate. This, however, was not the usual route traveled. Many negroes lived back of Tabor's house toward the oil mills, and could have access to Tabor's house by going through the field. Very few people were in the habit of passing Tabor's house. The oil mill and lower Freedmantown route, leading by Tabor's house, was the nearest but not the only route.

Robert Tabor testified that he heard of the loss of the money about nine o'clock a. m. He went horseback to defendant's house, but did not find him at home. He went to defendant's brother's house, about a mile from town, and found defendant. He first refused to come out, but being called a second time, he came out with a hatchet in his hand, and finally went to town with witness. Witness saw the tracks at his father's house, and the one at his father's store. They were alike. He did not notice the track made by defendant on his way to town. The State closed.

Sallie Archie, the first witness for the defense, testified that she was living with the defendant at the time of the alleged theft; was at home all that night; had a light all night, nursing a sick child. She knew that the defendant was in his room the whole of that night, and did not get up, or go out, at any time during the night. Pin Adams's son Clement came to the house about twelve o'clock that night, and called to defendant to get a gun, but the defendant refused to get up. A great many people were in the habit of passing along the lane which ran in front of defendant's gate. Witness was the wife of John Archie. She had not known Clement Adams very long at that time, but sufficiently long to recognize his voice when he called for the gun. Clement was now living in Galveston. Witness was morally certain that defendant did not leave the house that night. She

did not see him with any money, and got none from him subsequent to that night.

The questions discussed in the opinion were presented by the motion for new trial.

*A. C. Brietz* and *Henderson & Henderson,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. A bill of exceptions, to entitle it to be considered by this court, must have been presented to the trial judge during the term at which the trial was had for his allowance and signature, and within ten days after the conclusion of the trial. (Rev. Stats., Art. 1363; Code Crim. Proc., Art. 686.) In this case a bill of exceptions, objected to by the Assistant Attorney General, was allowed and signed by the trial judge, and filed in the record, during the term, and within ten days after an order of the court overruling the defendant's motion for a new trial. This, we think, was in compliance with the statute, and we so understand the statute to have been construed by our Supreme Court. (*R. R. Co.* v. *Joachimi,* 58 Texas, 452; *Blum* v. *Schram & Co.,* Id., 524.) The judgment of the court overruling the motion for a new trial being regarded as the "conclusion of the trial." 'If there had been no motion for new trial made, nor motion in arrest of judgment, the conclusion of the trial would be, we think, when the verdict of the jury is returned into court and has been received. (*McCall* v. *The State,* 14 Texas Ct. App., 353.)

2. It appears from a proper bill of exceptions that the prosecuting witness Tabor, whose money is charged to have been stolen by defendant, when testifying in the case in behalf of the State, instead of confining his testimony to *facts,* persisted in stating his *suspicions* and *conclusions* as to defendant's guilt. This was objected to by defendant's counsel, and the court was requested to require the examination of this witness by the district attorney to be so conducted as to elicit direct answers. The court refused to regulate the examination of the witness, but instructed him to confine himself to stating facts in answer to questions propounded to him, and the court also instructed the jury to disregard any statements made by the witness which were merely the suspicions, conclusions or opinions of the witness. Notwithstanding the court's instructions to this witness,

he still persisted in injecting into his testimony before the jury statements which were not evidence, and which were well calculated to prejudice the defendant in the minds of the jury. It also appears from the bill of exceptions that on a former trial of this case this same witness had testified in the same objectionable manner.

In his motion for a new trial the defendant made the conduct of this witness one of the grounds of his motion. In view of the very meagre evidence in the case tending to prove defendant's guilt, it is very probable that the illegal statements made by this witness, evincing, as he did, his conviction of defendant's guilt, influenced the jury in their verdict. The court, we think, was altogether too lenient with this witness. When he persisted in putting before the jury his suspicions, conclusions and prejudices against the defendant, after repeated requests and instructions not to do so, he should have been fined for contempt, and, if need be, imprisoned.

As to the inculpatory facts proven against the defendant, they are very few and of a very uncertain and unsatisfactory character. Tracks similar to his were discovered at the place where the money was lost, and these tracks were followed to his gate. These tracks, in connection with the witness Tabor's suspicions and conclusions, constitute the case of the State. No other facts, except as to the tracks, were proved by the State, which are entitled to be regarded as inculpatory, and the proof as to the identity of the tracks found with those made by the defendant is by no means certain. In our opinion, the evidence, even when supplemented with the witness Tabor's suspicions and opinions, is insufficient to exclude every other reasonable hypothesis than that of defendant's guilt.

We think the court erred in not granting the defendant a new trial, and for this error the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered May 28, 1884.